**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

AMBER SJON JUDD; SHAUNA
JENSEN; CHARLES MIRELEZ, also
known as Chico; and JEFFREY
JOHNSON, also known as Free,

Defendants - Appellants.

Nos. 00-4093, 00-4119,
00-4120 & 00-4121
(D. Ct. Nos. 99-CR-23-11-B,
99-CR-23-03-B, 99-CR-23-05-B
& 99-CR-23-17-B)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **HENRY**, Circuit Judges.

---

Defendants Charles Mirelez, Jeffrey Johnson, Shauna Jensen, and Amber Sjon Judd appeal their convictions for various offenses arising out of a methamphetamine conspiracy.[1]  We exercise jurisdiction pursuant to 18 U.S.C. § 1291, and AFFIRM in part and VACATE and REMAND in part.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] Richard Knudsen also brought a related appeal.  However, his appeal is rendered moot by his death.

## I. Background

In January of 1998, Detective Dale Bench was working with FBI Special Agent Scott Montefusco in an undercover capacity for a narcotics task force initiated by the FBI. On January 29, Charles Mirelez approached Bench. Claiming to be a member of the Sundowners motorcycle club, Mirelez offered to sell Bench methamphetamine. After conducting surveillance of the Sundowners' clubhouse, Montefusco confirmed that Mirelez was associated with the group and directed Bench to purchase the methamphetamine.

After this initial purchase, law enforcement officers initiated a full-scale investigation of the Sundowners Club. They placed pen registers and trap and trace devices on the clubhouse phone, logging 8500 phone calls from February to July of 1998. Bench made several additional purchases of methamphetamine from Mirelez.

On July 28, 1998, a court granted Montefusco's request for a warrant to wiretap the clubhouse phone for 30 days. The court later granted two 30-day extensions for the wiretap. It also approved a wiretap for the telephone of Travis Suazo, a suspected source of methamphetamine to the Sundowners. Finally, the court allowed officers to secrete a hidden microphone in an electronic gambling machine that Bench introduced to the clubhouse.

Later, Richard Knudsen, the clubhouse leader, agreed to sell Bench

methamphetamine. Knudsen never produced the drugs for Bench. He told Bench that he had lost the money when the location from which he was purchasing the drugs was raided by the FBI. He also informed Bench that the gambling machine had suffered losses of $2300, and that he expected to be reimbursed. As a result of the negotiations that ensued, the parties agreed to the sale of an additional two ounces of methamphetamine. The clubhouse microphone then revealed that members of the Sundowners Club were considering assaulting Bench and taking his money. The active portion of the investigation then terminated, having collected 683 pertinent telephone calls and 53 pertinent microphone calls. These calls led to the identification and arrest of defendants Jeffrey Johnson and Shauna Jensen.

On January 28, 1999, FBI agents executed a warrant to search the clubhouse. Over the course of the next few days, the various defendants were arrested on warrants based upon a Grand Jury Indictment. Judd pleaded guilty. Knudsen was tried jointly with Mirelez, Johnson, Jensen, and Michael Steward. Johnson and Mirelez moved to sever their trials, but their motions were denied. All appellants were convicted on a variety of offenses arising from the Sundowners conspiracy. Mirelez was sentenced to 188 months in prison, 5 years of supervised release, and special assessments of $1600. Johnson was sentenced to 24 months in prison followed by 5 years of supervised release. Judd was

sentenced to 36 months in prison and a 3-year term of supervised release.  Jensen was sentenced to 39 months' imprisonment, 3 years of supervised release, and a special assessment of $1000.

## II.  Discussion

The four defendants have raised several different issues on appeal.  One or more defendants challenge: (a) convictions related to distribution of ephedrine; (b) the necessity of the wiretaps; (c) alleged omissions to the wiretap affidavits; (d) the denial of a motion to supplement the record; (e) improper joinder; (f) admission of prejudicial evidence; (g) sufficiency of the evidence; and (h) sentencing error.  The government properly concedes error on the first issue.  We affirm the ruling of the district court on the remaining six issues.

### A.    Distribution of Ephedrine

Mirelez moved for a judgment of acquittal on Counts 19 and 20.  Count 19 consisted of conspiracy to distribute a controlled substance, while Count 20 consisted of unlawful use of a telephone to facilitate the distribution of that substance.  The substance related to Counts 19 and 20 in the instant case was ephedrine, a precursor to methamphetamine.  The trial court then extrapolated the amount of methamphetamine that could be yielded for purposes of sentencing.  Mirelez argues that 21 U.S.C. § 812 lists controlled substances, and does not list ephedrine.  Rather, ephedrine is a "listed" substance under 21 U.S.C. §

- 4 -

802(34)(C). On appeal, the government concedes that the trial court erred in denying Mirelez's motion for judgment of acquittal. We therefore vacate the convictions on these counts and remand for resentencing.

B.      The Necessity of the Wiretap

All four defendants challenge the admission of the wiretap evidence, arguing that the warrant was invalid because the government failed to demonstrate a necessity to conduct electronic surveillance. This circuit has conflicting authority as to whether a trial judge's determination on the necessity of a wiretap is reviewed de novo or for an abuse of discretion. Compare United States v. Castillo-Garcia, 117 F.3d 1179, 1186 (10th Cir. 1997) ("The question of whether the government demonstrated sufficient "necessity" . . . to support the issuance of a wiretapping order is a question of law which we review de novo."), with United States v. Armendariz, 922 F.2d 602, 608 (10th Cir. 1990) ("[W]e review the conclusion that the wiretap[ ] [was] necessary in each situation for an abuse of discretion."). Because the government demonstrated a sufficient showing of necessity to meet either standard, we need not reconcile this conflict in this case.

Defendants bear the burden of proving that a wiretap is invalid once it has been authorized. United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995). Before a court may validly issue a wiretap warrant, the government must

demonstrate its necessity by showing that traditional investigative techniques have been tried unsuccessfully, are unlikely to be successful, or are too dangerous to attempt. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c). Traditional techniques include standard visual and aural surveillance, questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary), use of search warrants, and infiltration of groups by undercover agents or informants. If any of these techniques has not been tried, the government must explain why with particularity. Castillo-Garcia, 117 F.3d at 1187. If other techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered. Id. We evaluate necessity on a case-by-case basis, considering "all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap." Id. at 1187. We read the necessity requirement "in a common sense fashion . . . , and it is not necessary that every other possible means of investigation be exhausted." United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir. 1989). A successful challenge to the necessity of a wiretap results in the suppression of evidence seized pursuant to that wiretap. United States v. Green, 175 F.3d 822, 828 (10th Cir. 1999).

It is undisputed that a variety of investigative techniques were used, including informants, undercover officers, surveillance, pen registers, and trace

devices. Bench successfully penetrated the clubhouse, and pen registers sometimes revealed whom Mirelez was calling to obtain the drugs. Officers used this information to conduct surveillance on the houses he contacted. Bench also spoke with a number of club members regarding drug transactions.

While these traditional techniques produced results, the affidavits submitted demonstrated that they were insufficient results. The affidavits reveal that the identity of several people connected to the clubhouse still remained hidden after these conversations. While Bench was reasonably successful in his undercover role, a large amount of information as to the identities of buyers and suppliers remained unknown. Club members made clear that much of this information was secret. While Bench might have been able to become a member of the group, the affidavits indicate that this might have required him to commit illegal acts as part of his membership.

Physical surveillance brought about the same mixed results. Surveillance is not successful simply because it is not detected. Although surveillance was used successfully to identify some persons responsible for delivering drugs, most business was conducted within the clubhouse, where surveillance was, at best, difficult. Moreover, surveillance does not easily distinguish between innocent encounters and those that involve a drug transaction, absent clues about the content of conversations leading up to the encounters. Finally, conducting

surveillance outside of the clubhouse was difficult without electronic surveillance that revealed the location of the transaction and the type of meeting that would take place. While this information could sometimes be inferred from a pen register, at other times it could not.

The government also used three confidential sources. These sources provided useful information, such as evidence that Catherine Masterson supplied drugs to Mirelez. However, none of the sources had current contact or involvement with the club. Their information was of a background nature only. Nothing indicates that confidential sources existed who had not been approached. The record indicates that confidential sources were of limited use in these investigations.

The other techniques used were also insufficient to expose the conspiracy thoroughly. As noted above, pen registers and call tracing were sometimes useful, but were unsuccessful in thoroughly exploring the conspiracy. Executing search warrants would likely have been counterproductive because drugs were rarely kept at the clubhouse. The affidavit indicates that a grand jury investigation would have been futile, since many members of the club would have refused to testify, even under a grant of immunity.

The wiretapping statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in

question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000) (citing United States v. Baker, 589 F.2d 1008, 1013 (9th Cir. 1979)). Rather, it simply requires that the government unsuccessfully attempt traditional means of investigation before resorting to wiretapping. Here, the government used traditional means, and was left with many important questions unanswered. The government thus made a sufficient showing of necessity. Plaintiffs have not overcome the presumed validity of the wiretap authorization. We therefore hold that the district court correctly found that a wiretap authorization was necessary under these circumstances.

C.    Affidavit Omissions

Judd argues that the lower court improperly refused to hold an evidentiary hearing on her allegations that Agent Montefusco intentionally or recklessly made material omissions in the affidavits for the wiretaps. If substantiated, this would constitute reversible error under Franks v. Delaware, 438 U.S. 154 (1978). However, she raises this argument only in footnotes 2 and 5 of her brief. Arguments made in a perfunctory manner, such as in a footnote, are waived. Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("[A]n argument made only in a footnote [is] inadequately raised for appellate review."); Nat'l Foreign

- 9 -

Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived."). Judd therefore waived this argument on appeal, and we do not address it.

D.     Motion to Supplement the Record

The district court denied Mirelez's motion to supplement the record on his motion to suppress evidence. It is unclear from the briefs whether Mirelez's complaint is with the district court's refusal to supplement the record on appeal or in the district court. We review either question for an abuse of discretion. United States v. Oliver, 278 F.3d 1035, 1042 (10th Cir. 2001) (refusal to supplement the record on appeal is evaluated under an abuse of discretion standard); Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 894 (10th Cir. 1997) (refusal to admit evidence at the summary judgment phase evaluated for an abuse of discretion).

Mirelez sought to supplement the record with evidence demonstrating a lack of necessity for the wiretaps. This evidence consisted of video surveillance of the clubhouse, a discussion of a controlled purchase, two indictments, physical surveillance logs, evidence regarding the identity of Catherine Masterson, and the use of a body microphone by Bench. Given the 22 volumes of record evidence on appeal, and the strong showing of necessity made by the government, we find that

the district court did not abuse its discretion.

E.     Improper Joinder/Refusal to Sever

Johnson appeals the trial court's denial of his motion to sever his trial from Knudsen's. We review a decision to deny a severance for an abuse of discretion, and the trial court's decision "will not ordinarily be reversed in the absence of a strong showing of prejudice." United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983). The defendant must demonstrate that the alleged prejudice outweighed the expense and inconvenience of separate trials. United States v. Martin, 18 F.3d 1515, 1518 (10th Cir. 1994).

The Federal Rules of Criminal Procedure provide that "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed. R. Crim. P. 14. "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' . . . is sufficient to warrant severance." United States v. Powell, 982 F.2d 1422, 1432 (10th Cir. 1992) (citation omitted). The defendant thus carries a heavy burden. Valentine, 706 F.2d at 290.

Here, Johnson has not met the burden of showing sufficient prejudice to warrant severance. Johnson argues that because he was no longer a member of

the Sundowners Club it was unfairly prejudicial to him to try him in a setting where a great deal of evidence was offered on the nature of the Sundowners Club. Additionally, Johnson argues that sequestering the jury prejudiced his trial by raising questions in the jurors' minds about the potential dangerousness of the defendants. Johnson's entire argument for severance hinges upon the "spillover effect" – that is, that circumstances uniquely relevant to the trials of members of the Sundowners would influence jurors' decisions about his guilt or innocence. As noted above, that is insufficient to warrant severance. The district court tried to avoid spillover, explaining that the sequestration was to avoid publicity, and not because of any potential danger arising from a trial of a motorcycle gang. The district court did not abuse its discretion by refusing to sever the trials.

F.    Admission of Prejudicial Evidence

Mirelez and Johnson argue that their trials were unfair due to the admission of prejudicial evidence regarding the Sundowners gang. We review a trial judge's decision to admit evidence for an abuse of discretion. Oliver, 278 F.3d at 1042.

Evidence must be relevant to be admissible. Fed. R. Evid. 402. A trial judge may refuse to admit relevant evidence if it is more prejudicial than probative. Fed. R. Evid. 403. "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a).

Defendants object to the admission of, among other things: a videotape of the Sundowner's clubhouse showing firearms on the premises; a metal plaque in the shape of a saw blade that said "Sundowners MC New Year's Bash"; a patch with the word "property" indicating that each member is property of the club; a sign stating "what you think you might have seen or heard here stays here"; three photos of Sundowners members, dressed in leather, at a pool table; six photos of tattoos worn by members of the club; and testimony that "FTW" on Knudsen's patch meant "f**k the world."

Defendants contend that the challenged evidence was not probative, but simply reinforced stereotypes about bikers. They note that only five active members of Sundowners were actually charged in the conspiracy. However, Count 1 against Richard Knudsen — the Continuing Criminal Enterprise count — was based almost entirely upon his position as head of the Sundowners gang. Evidence regarding the club culture was therefore relevant to the trial. There is no indication that the evidence was admitted in order to impugn the defendant's character. There is no indication that the jurors would be influenced by this evidence, especially considering that voir dire concentrated in large part on eliminating those jurors who expressed prejudice toward motorcycle clubs. The trial judge did not abuse her discretion by admitting this evidence. See United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992) (holding that gang

membership "helped to establish an agreement among the subjects, the purpose of the conspiracy and knowledge on the part of these defendants").

G.     Sufficiency of the Evidence

Mirelez and Johnson each challenge the sufficiency of the evidence supporting one count of their respective convictions. We review a challenge to the sufficiency of the evidence de novo, drawing all reasonable inferences in the light most favorable to the government, and limiting our inquiry to determining whether any rational trier of fact could have found the elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1.     Mirelez

Mirelez argues that the government failed to provide sufficient evidence to support a conviction for conspiracy with regard to Count 47. A conviction for conspiracy requires "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence of the alleged conspirators." United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997).

Mirelez argues that he intended to defraud Bench by taking his money and never delivering drugs. Mirelez therefore argues that there was never an agreement to commit an illegal act. However, the evidence presented in the

record is consistent with Knudsen and Mirelez conspiring to sell Bench a substance that contained methamphetamine, but in a greatly diluted form. There is sufficient evidence for the jury to make such an inference. We find ample evidence from which a jury could reasonably infer that Mirelez conspired to violate the law.

2.    Johnson

Johnson challenges Count 57 of the indictment, which involved a conspiracy among Michael Steward, Robert Dale, Wayne Davis, and Knudsen. Johnson also challenges the underlying Counts 58 and 61, use of a telephone to facilitate a conspiracy.

Johnson delivered one-sixteenth of an ounce of methamphetamine. He argues that this amount is inconsistent with distribution, and that he therefore lacks the requisite intent necessary for a conspiracy to distribute. Nonetheless, the record indicates that Dale made clear to Johnson that he wished to purchase a larger amount, which would have been consistent with distribution. Thus, sufficient evidence exists from which a rational jury could have inferred that Johnson was guilty of conspiracy to distribute.

H.    Sentencing

Johnson challenges the propriety of his sentencing. We review a sentencing court's factual findings for clear error, and its application of the law to

the facts de novo.  United States v. Perez de Dios, 237 F.3d 1192, 1195 (10th Cir. 2001).

Johnson argues that his sentencing was improper because the sentencing court could not have determined that the drug he intended to sell was crystal methamphetamine rather than less pure "ice" methamphetamine.  Wiretap evidence gathered from the clubhouse reveals that Johnson had offered Robert Dale methamphetamine of "excellent" quality.  During a phone conversation with Dale, Knudsen referred to the drug transaction stating, "You don't know whether he had crystal or not." Dale replied, "Yeah, he does."

Given the above evidence, we cannot say the court committed clear error in concluding that Johnson had sold crystal methamphetamine.

### III.  Conclusion

For the forgoing reasons, we AFFIRM in part, VACATE in part, and REMAND in part for resentencing not inconsistent with this opinion.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge